IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    06-CR-116-BR

               Plaintiff,                  OPINION AND ORDER

v.

BENNY CUAUHTEMOC COVARRUBIAS,

              Defendant.


**KARIN J. IMMERGUT**
United States Attorney
**GEOFFREY A. BARROW**
**LESLIE J. WESTPHAL**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204
(503) 727-1017

              Attorneys for Plaintiff

**STEVEN J. SHERLAG**
Law Office of Steven J. Sherlag
621 S.W. Morrison Street, Suite 900
Portland, OR 97205
(503) 227-5200

1  -  OPINION AND ORDER

RONALD D. HEDDING
HEDDING LAW FIRM
16000 Ventura Boulevard
Penthouse Suite 1208
Encino, CA 91436
(818) 986-2092

        Attorneys for Defendant


**BROWN, Judge.**

    This matter comes before the Court on the Motion to Suppress
(#62) filed by Defendant Benny Cuauhtemoc Covarrubias.

    Following the November 2, 2006, evidentiary hearing on
Defendant's Motion, the parties submitted supplemental written
arguments.  The Court took the matter under advisement on
November 27, 2006.  Thereafter the Court requested the parties to
clarify their positions as to certain issues, and the parties
filed additional memoranda (#86, #91, #92) as of December 14,
2006.  In addition, Defendant filed a Further Supplemental
Memorandum re *Miranda* Inquiry (#93) on December 27, 2006.

    For the reasons that follow, the Court **DENIES** all parts of
Defendant's Motion except as to Defendant's "*Miranda* Inquiry."
The Court will conduct further proceedings in due course to
determine the unresolved *Miranda* issues.


                    <u>**BACKGROUND**</u>

    In a Second Superseding Indictment dated June 6, 2006, the
government charges Defendant with Conspiracy to Distribute and

2  -  OPINION AND ORDER

Possession with Intent to Distribute Five Kilograms or More of a Mixture or Substance Containing a Detectable Amount of Cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846.

The charge arises from the investigative efforts of a multi-agency Joint Task Force (JTF) based in Portland, Oregon, beginning in the summer of 2005 that led to Defendant's arrest on March 8, 2006, after a traffic stop in California.  During the investigation, JTF officers found probable cause to believe that Defendant was acquiring cocaine in Southern California and distributing it in the Portland area.  In due course, investigators obtained judicial authorizations for a GPS tracker on Defendant's Mercedes Benz vehicle and for pen-register monitoring of Defendant's cell phone.

On March 4, 2006, GPS data indicated Defendant's vehicle was traveling south from the District of Oregon.  In anticipation that Defendant was going to southern California to pick up drugs, the Portland investigators contacted DEA agents in Los Angeles, who assisted in setting up surveillance of Defendant's activities in the area.  The parties and the Court agree by the early morning hours of March 8, 2006, the drug investigators had probable cause to believe that Defendant had picked up a supply of cocaine and would be driving back to Oregon with the cocaine in his Mercedes.

3  -  OPINION AND ORDER

At about 4:15 a.m. on March 6, 2006, GPS data showed Defendant's vehicle was leaving the area and heading north on Interstate 5 (I-5).  The investigators relayed requests to the California Highway Patrol and other police agencies to watch for Defendant's vehicle and to conduct a "walled off" stop of the vehicle with the goal of searching it.  Ultimately a Kings County, California, deputy stopped Defendant's vehicle and searched it in the course of the stop, found cocaine and cash, and arrested Defendant and his passenger, James Patrick Apodaca.[1] Based in part on results of the stop, search, and arrests, the Portland investigators obtained and executed search warrants in Oregon by which they seized weapons and more drugs and cash.

In his Motion to Suppress, Defendant seeks an order suppressing all of the seized evidence as well as evidence of his post-arrest statements.  According to Defendant, the warrantless stop, search, and seizure of Defendant, his vehicle, and his effects violated his rights under the Fourth Amendment.  Although Defendant concedes the Portland and Los Angeles investigators collectively had probable cause to believe that Defendant was in possession of cocaine and was transporting it to Oregon at the time he was stopped in California, Defendant contends any justification for the stop, search, and arrest must arise from

---

[1] Apodaca is a co-defendant in this matter and has pleaded guilty to conspiracy to possess with intent to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

the circumstances of the stop itself because the fact that
probable cause existed to arrest Defendant was not communicated
to the deputy who conducted the stop and, therefore, the deputy
could not have relied on the "collective knowledge" of the
investigators to justify the stop and ensuing events.

In addition, Defendant maintains the circumstances
surrounding the stop were insufficient to support the officers'
warrantless Fourth Amendment intrusions.  In particular,
Defendant argues (1) there was not any factual basis to stop him
for speeding; (2) the length and scope of the stop were not the
least intrusive means available for a traffic-infraction stop;
and (3) there was not any lawful consent to search the vehicle,
any alleged consent was limited in scope, and the officers
ignored such limits without justification.  Moreover, Defendant
argues the search warrants for his residence and another vehicle
were based on the fruits of the allegedly illegal traffic stop,
and, therefore, all of the evidence seized pursuant to the search
warrants also should be suppressed.  Finally, in response to the
Court's request for clarification of Defendant's arguments, it
appears Defendant also challenges the admissibility of his post-
arrest statements under *Miranda* and, in any event, contends his
statements should be suppressed because they were obtained as a
result of the alleged Fourth Amendment violations.

In response, the government asserts the collective knowledge

of the drug investigators who established probable cause extends
to and justifies the stop of Defendant's vehicle and the ensuing
seizures of evidence even if the deputy who stopped the vehicle
was "walled off" from the basis of such knowledge and from the
fact that there was probable cause to arrest Defendant for a drug
crime.  In addition, the government maintains suppression is not
warranted under the Fourth Amendment in these circumstances.
Finally, the government contends Defendant waived any argument
that his statements should be suppressed because of an alleged
*Miranda* violation.

　　Although the government previously argued the stop,
searches, and arrests were independently justified based solely
on the circumstances of the stop, the government withdrew that
argument in its post-hearing memoranda.  Thus, the primary focus
of the Court's analysis herein is the application of the so-
called "collective knowledge" doctrine in circumstances such as
these.


**FINDINGS OF FACT**

　　The Court has weighed and evaluated all of the evidence
presented at the November 2, 2006, suppression hearing and finds
the following facts by a preponderance of the credible evidence:

　　1.  Beginning in the summer of 2005, investigative efforts
of a multi-agency JTF based in Portland, Oregon, found probable

6  -  OPINION AND ORDER

cause to believe that Defendant was acquiring cocaine in southern California and distributing it in the Portland area.  The investigators obtained judicial authorizations for a GPS tracker on Defendant's Mercedes Benz vehicle and for pen-register monitoring of Defendant's cell phone.

2.   On March 4, 2006, GPS data indicated Defendant's vehicle was traveling south from the District of Oregon.  In anticipation that Defendant was going to southern California to pick up drugs, the Portland investigators contacted DEA agents in Los Angeles, including DEA Special Agent Matthew Keller who assisted in setting up surveillance of Defendant's activities in the area.  By the early morning hours of March 8, 2006, the drug investigators had probable cause to believe that Defendant had picked up a supply of cocaine and would be driving back to Oregon with the cocaine in his Mercedes.

3.   At about 4:00 a.m., Portland-based investigator Richard Scott Morris, who is a Senior Special Agent with Immigration Customs Enforcement (ICE), was monitoring the GPS connection with Defendant's vehicle and noted Defendant's vehicle was leaving its parked location near the residence of Defendant's girlfriend on Harper Avenue in Los Angeles.  SA Morris telephoned SA Keller, informed him the vehicle was moving, and kept Keller updated on the vehicle movements in 5-10 minute intervals.  Eventually GPS data indicated Defendant's vehicle was heading north on I-5, and

the investigators concluded Defendant was returning to Oregon.

4.   The investigators planned to have Defendant's vehicle stopped and searched and, if cocaine was found, to have Defendant arrested.  Because they also hoped to continue the investigation for the purpose of identifying Defendant's source of cocaine supply in California, they did not want the stop conducted in a way that might alert Defendant, his passenger, or anyone else that a larger investigation was under way.  Thus, the investigators relayed various requests to the California Highway Patrol and other local police agencies to watch for Defendant's vehicle and to conduct a "walled off" stop of the vehicle with the initial goal of searching it.

5.   Ultimately the request was relayed to Daniel Hoslett, a Kings County, California, sheriff's deputy.  The Court notes I-5 runs through Kings County, which is located in the Central Valley area of California north of Los Angeles.  Deputy Hoslett has more than 11 years of experience in law enforcement, has been a Kings County deputy sheriff for about eight years, and has made more than one hundred traffic stops involving narcotics.

6.  Early in Deputy Hoslett's day shift on March 8, 2006, his supervisor, Sergeant Steve Frye, asked him via a cell-phone conversation to watch for a Black Mercedes with Oregon plates

8  -  OPINION AND ORDER

traveling northbound on I-5 and to make a "walled off" stop of
the vehicle if Deputy Hoslett observed a basis to do so.
Sergeant Frye told Deputy Hoslett that the request originated
from an outside agency and came to Sergeant Frye from a Sheriff's
Office narcotics officer.  That morning, Deputy Hoslett was
driving a marked patrol vehicle and had both a trainee deputy
sheriff and a police canine with him.  The dog, however, was not
trained in narcotics detection.

     7.  The Kings County Sheriff's Office receives about four
requests a year from other-agency narcotics officers to make
"walled off" traffic stops.  Based on his experience, Deputy
Hoslett understands a request for a "walled off" stop means an

> agency is investigating the occupants of the vehicle,
> or the vehicle itself, and believes that it's carrying
> narcotics.  They let the vehicle get out of their area
> and have an unrelated agency conduct a traffic stop on
> the vehicle, and then investigate it and try to obtain
> a search and look for narcotics.

Even though Sergeant Frye did not explicitly state to Deputy
Hoslett that there was "probable cause" or "reasonable suspicion"
to stop the vehicle or that its occupants were engaged in
criminal activity, Deputy Hoslett interpreted the request for a
"walled off" stop to mean that other officers thought there were
narcotics in the vehicle and wanted to see whether a basis to
search the vehicle could be established independent of a larger
narcotics investigation.

9  -  OPINION AND ORDER

8.   In response to Sergeant Frye's request, Deputy Hoslett began to observe northbound traffic on I-5.  Shortly after 6:30 a.m., Deputy Hoslett saw Defendant's black Mercedes with Oregon plates driving northbound at a speed that appeared to be greater than the posted speed limit of 70 miles per hour.  Deputy Hoslett began to follow and to pace the Mercedes from a distance for approximately one mile.  The Mercedes was traveling about 79 miles per hour.  When Deputy Hoslett closed the gap between the vehicles, the Mercedes slowed to approximately 50 miles per hour and moved to the right-hand traffic lane.

9.   Deputy Hoslett turned on the overhead lights of the patrol vehicle to signal the Mercedes to stop so that he could conduct the requested "walled off" stop on the pretext of the speeding violation that he had observed.  Although the right-turn signal on the Mercedes came on after Deputy Hoslett's turned on his overhead lights, the Mercedes continued traveling northbound at about 50 miles per hour, which, in turn, caused Deputy Hoslett to anticipate that the Mercedes might try to flee.  After about a mile, however, the Mercedes pulled to the right shoulder on I-5 near the Highway 41 exit and then stopped.

10.  Deputy Hoslett approached the driver's side of the Mercedes, and the trainee deputy approached on the passenger side.  Both officers had their weapons out of their holsters, but the weapons were not pointed at the Mercedes or its occupants.

10 -  OPINION AND ORDER

Defendant was in the driver's seat, and Patrick Apodaca was in the right front seat. Deputy Hoslett told Defendant the reason for the stop was that he had observed the Mercedes speeding. Defendant replied, "I was doing 80 miles per hour."

11. Deputy Hoslett asked for and Defendant provided his driver's license, vehicle registration, and proof of insurance. Deputy Hoslett took Defendant's documents back to the patrol vehicle while the trainee deputy continued to observe the vehicle and occupants. When Deputy Hoslett returned to the Mercedes, he directed Defendant to step out of the car and to go to the area behind the Mercedes and in front of the patrol vehicle.

12. When Defendant reached the rear of the Mercedes, Deputy Hoslett patted him down to check for weapons as a precaution. Deputy Hoslett asked Defendant where he was coming from. Defendant responded he had been in the L.A. area visiting family, and he also mentioned a plan to visit the Magic Mountain amusement park. When asked how he knew the passenger, Defendant said Apodaca worked for Defendant at his bar.

13. Deputy Hoslett left Defendant between the two vehicles where Defendant likely was seated on the pavement. Deputy Hoslett went to the passenger's door where he either asked or directed Apodaca also to get out of the vehicle. Deputy Hoslett patted Apodaca down for officer safety and then asked Apodaca where he and Defendant had been and how he knew Defendant.

11 - OPINION AND ORDER

Although Apodaca also said they had been visiting relatives in the L.A. area, Deputy Hoslett suspected the response was false because he did not think there was a family resemblance between Defendant and Apodaca.  When Apodaca indicated he and Defendant were neighbors and did not mention working for Defendant, Deputy Hoslett thought this was significant and might indicate an effort to cover up the true relationship between the men and their reason for being in southern California.

14.  Deputy Hoslett directed Apodaca to go to the rear of the Mercedes where Deputy Hoslett began the process of writing a speeding citation.  Before he issued any citation, however, Deputy Hoslett asked Defendant and Apodaca whether they had anything illegal in the vehicle such as "guns, drugs, [or] open containers of alcohol" and whether he could search the vehicle. Although Deputy Hoslett was suspicious based on the outside agency's request for a "walled off" stop through a Sheriff's Office narcotics officer as well as what he thought were inconsistencies in the statements of Defendant and Apodaca, the Court notes Deputy Hoslett did not have any particular basis to suspect that guns, drugs, or alcohol were in the vehicle.  In any event, both Defendant and Apodaca said "yes" to the request for consent to search.  Defendant also added something like "whatever will get us on our way faster."  Neither Deputy Hoslett in his request nor Defendant and Apodaca in their responses limited the

area to be searched.  Deputy Hoslett began searching the area
around the passenger seat and found a backpack behind the
passenger seat.  In the backpack, Deputy Hoslett found a glass
"smoking device" that contained burnt residue and green leafy
material that looked and smelled like marijuana.  Apodaca said
the pipe was his.

15.  Upon finding the marijuana, Deputy Hoslett suspected
more drugs would be found in the car.  He radioed for a "narcotic
detection canine" to be brought to the stop for a quicker, less-
intrusive, and more thorough search of the vehicle.  About 20
minutes later, Deputy Darin Scott Pearson arrived with his dog,
"Carlo," a narcotics canine certified through the California
Narcotic Canine Association.

16.  Before allowing Carlo into the vehicle, Deputy Pearson
asked Defendant whether he had "narcotics or anything illegal" in
the vehicle, and Defendant replied he did not.  Deputy Pearson
also asked Defendant "if it would be okay" if he searched the
vehicle, and Defendant said it would be okay.  At Deputy
Pearson's request, Deputy Hoslett removed a picture frame
containing glass from the backseat area of the Mercedes to
protect it from the dog.  Deputy Hoslett also removed luggage
(two black bags and one red bag) from the trunk and left them on
the pavement near the open trunk.  Neither Defendant nor Apodaca
objected to the apparent scope of the search.

13 -  OPINION AND ORDER

17.  After he was inside the Mercedes, Carlo "alerted" and began to bark.  Carlo's alert was directed to the rear of the backseat area.  Defendant reacted visibly to the barking, became pale, and looked like he was going to be sick.  Outside of the vehicle, Carlo also alerted to the two black bags, which Defendant identified as belonging to him.  Deputy Hoslett opened the black bags, and he found the cocaine at issue in this case inside one of the bags.  Specifically, Deputy Hoslett found four plastic packages wrapped in tape inside the bag and two more packages in an outer compartment.

18.  Defendant and Apodaca were taken into custody.  Deputy Hoslett did not issue any speeding citation because his training is not to do so if a basis to arrest for a more serious charge develops during the investigation of a traffic violation.


## STANDARDS

### I.  Fourth Amendment.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.

U.S. Const. amend. IV.  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)(citations omitted).


14 -  OPINION AND ORDER

A.    **Reasonable Seizures.**

A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Hensley*, 469 U.S. 221, 226 (1985). "An investigatory stop of a vehicle is reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic violation has occurred." *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006)(citing *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005). "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001)(quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).

The scope of a traffic stop must be carefully tailored to the reasons supporting the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop" and should employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. After the reason for the stop is resolved, the legitimate investigative purpose of the traffic stop is completed. *Id*. "An officer must initially restrict the questions he asks during a stop to those that are reasonably

related to the justification for the stop." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001), *amended by* 279 F.3d 1062 (9th Cir. 2002).  The scope of the questions asked during a stop may be expanded if the officer "notices particularized, objective factors arousing his suspicion." *Id.* The detention may not be prolonged, however, if the officer merely develops an "inchoate and unparticularized suspicion or 'hunch.'" *Id.*

A police officer has probable cause to arrest a suspect without a warrant if the available facts suggest a "fair probability" that the suspect has committed a crime. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006)(quoting *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002)).

Moreover, a seizure may be justified under the Fourth Amendment based on "the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop." *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986).  The "collective knowledge rule applies where an officer makes an investigatory stop based in part on information or directions from other law enforcement officials." *Id.* (citing *United States v. Merritt*, 695 F.2d 1263, 1268 & n.9 (10th Cir.

1982), *cert. denied*, 461 U.S. 916 (1983).  *See also United States
v. Mayo*, 394 F.3d 1271, 1275 (9th Cir. 2005).

> Indeed, "[t]he accepted practice of modern law
> enforcement is that an officer often makes arrests at
> the direction of another law enforcement officer even
> though the arresting officer himself lacks actual,
> personal knowledge of the facts supporting probable
> cause." *United States v. Jensen*, 425 F.3d 698, 704
> (9th Cir. 2005); see also *Sutton*, 794 F.2d at 1426-27
> (upholding the validity of a stop made by a local
> Sheriff's Deputy responding to a U.S. Customs' request
> to stop a vehicle at an abandoned airfield, which U.S.
> Customs had probable cause to believe was being used as
> a "drop site" for illegal narcotics); *United States v.
> Ibarra-Sanchez*, 199 F.3d 753, 759-60 (5th Cir. 1999)
> (upholding the validity of a stop made by a local
> police officer responding to a DEA request for
> assistance in stopping a van, which DEA believed was
> being used to smuggle drugs).

*United States v. Rios-Ruiz*, No. CR-05-98-06-RE, 2006 WL 3408027,
at *4-5 (D. Or. Nov. 22, 2006).

**B.   Reasonable Searches.**

In general, the Fourth Amendment requires police
officers to obtain a warrant supported by probable cause before
conducting a search.  *Payton v. N.Y.*, 445 U.S. 573, 586 (1980).

It is a well-settled exception to the warrant
requirement, however, that an "individual may waive his Fourth
Amendment rights by giving voluntary and intelligent consent to a
warrantless search of his person, property, or premises." *United
States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000), *cert.
denied,* 531 U.S. 1174 (2001).  The Ninth Circuit "considers the
following five factors in determining whether a person has freely

consented to a search:  (1) whether defendant was in custody;

(2) whether the arresting officers had their guns drawn;

(3) whether Miranda warnings were given; (4) whether the

defendant was told he had the right not to consent; and

(5) whether the defendant was told that a search warrant could be

obtained."  *Id.  See also Ohio v. Robinette*, 519 U.S. 33, 40

(1996).  No single factor is dispositive.  *See United States v.*

*Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988).  In addition,

> [o]fficers who have probable cause to believe that an
> automobile contains evidence of a crime may search the
> vehicle, including the trunk and all containers in
> which there is probable cause to believe that evidence
> was concealed.  *United States v. Ross*, 456 U.S. 798,
> 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

*United States v. Alvarez*, 899 F.2d 833, 839 (9th Cir. 1990).  *See*

also *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)("If a car is

readily mobile and probable cause exists to believe it contains

contraband, the Fourth Amendment . . . permits police to search

the vehicle without more.")(quoting *Pa. v. Labron*, 518 U.S. 938,

940 (1996)).

## II.  **Fifth Amendment.**

An officer's obligation to give a suspect *Miranda* warnings

before interrogation extends only to those instances when the

individual is "in custody."  *Oregon v. Mathiason*, 429 U.S. 492,

495 (1977)(per curiam).

> The case books[, however,] are full of scenarios in
> which a person is detained by law enforcement officers,
> is not free to go, but is not "in custody" for *Miranda*

> purposes.  A traffic stop is not custody.  *Berkemer*
> *v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82
> L. Ed. 2d 317 (1984).  A *Terry* stop-and-frisk is not
> custody.

*United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).

Moreover,

> [n]ot every question asked in a custodial setting
> constitutes "interrogation."  *United States v. Booth*,
> 669 F.2d 1231, 1237 (9th Cir. 1982).  The test is
> whether, under all the circumstances involved in a
> given case, the questions are "reasonably likely to
> elicit an incriminating response from the suspect."
> *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301,
> 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

*United States v. Chen*, 439 F.3d 1037, 1039 (9th Cir. 2006).

For a statement made during a custodial interrogation to be
admissible, any waiver of constitutional rights must be
voluntary, knowing, and intelligent.  *Miranda v. Arizona*, 384
U.S. 436, 479 (1966).  A valid waiver depends on the totality of
the circumstances, including the background, experience, and
conduct of the defendant.  *North Carolina v. Butler*, 441 U.S.
369, 374-75 (1979).  To be knowing and intelligent, "the waiver
must have been made with a full awareness of both the nature of
the right being abandoned and the consequences of the decision to
abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The
test for voluntariness is "whether, considering the totality of
the circumstances, the government obtained the statement by
physical or psychological coercion or by improper inducement so
that the suspect's will was overborne."  *Derrick v. Peterson,* 924

F.2d 813, 817 (9th Cir. 1990)(quoting *United States v. Leon
Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  The government
has the burden of showing a valid waiver.  *North Carolina v.
Butler*, 441 U.S. at 373.  There is a presumption against
waiver.  *Id*.


## DISCUSSION

**I.   Initiating the traffic stop of Defendant's vehicle was
        justified under the Fourth Amendment.**

As noted, an officer who observes a traffic violation is
justified under the Fourth Amendment to stop the vehicle and to
initiate an investigation tailored to the purpose of the stop.
Because Deputy Hoslett observed Defendant's vehicle traveling
faster than the posted speed, he was authorized to stop the
vehicle and to investigate the violation.

**II.  Without the "collective knowledge" of the JTF and DEA
        investigators, there was not any basis to expand the traffic
        stop to questions about drugs and weapons or to request
        consent to search the vehicle.**

The government has withdrawn its argument that the events
that led to the search of Defendant's vehicle, the discovery of
cocaine inside Defendant's bag, and Defendant's arrest could be
justified under the Fourth Amendment solely on the circumstances
of the traffic stop.  Because Deputy Hoslett was not given any
information about the basis for the request that he make a
"walled off" stop of Defendant's vehicle, the Court concludes any

inference he drew about suspicion that the vehicle was involved in a drug crime was not tied to any articulable facts and, therefore, could not support expanding the traffic stop beyond investigation of the speeding violation.  Moreover, the perceived "inconsistencies" in statements from Defendant and Apodaca about their reasons for being in L.A. did not suffice objectively to expand the scope of the traffic stop to questions about drugs and guns or to request consent to search.[2]  Thus, without the "collective knowledge" of the JTF and DEA investigators, there would not have been any justification under the Fourth Amendment to detain Defendant beyond what was necessary to issue a speeding citation.

**III. Because the collective knowledge of JTF and DEA agents established probable cause to believe Defendant was transporting cocaine in his vehicle, those investigators would have been justified under the Fourth Amendment to stop and to search Defendant's vehicle and to arrest Defendant.**

As noted, the Fourth Amendment permits a police officer to arrest a suspect without a warrant if the available facts suggest a "fair probability" that the suspect has committed a crime. *Tatum v. City and County of San Francisco*, 441 F.3d at 1094 (quoting *United States v. Valencia-Amezcua*, 278 F.3d at 906). Moreover, under the "automobile exception" to the warrant

---

[2] Although the circumstances of the stop alone did not justify a request for consent to search, the Court concludes under the totality of the circumstances that Defendant voluntarily consented to the search of his vehicle and did not exclude the trunk area of the vehicle from that consent.

requirement, a police officer may search the trunk of a vehicle without a warrant if the officer has probable cause to believe it contains evidence of a crime.  *United States v. Alvarez*, 899 F.2d 833, 839 (9th Cir. 1990).  Here it is undisputed that the drug investigators had probable cause to believe Defendant was transporting cocaine in his vehicle.  Thus, those investigators would have been justified under the Fourth Amendment to stop and to search Defendant's vehicle and to arrest Defendant without a warrant.

**IV.  The absence of explicit communication to Deputy Hoslett that there was probable cause to arrest Defendant does not require suppression under the Fourth Amendment under these circumstances.**

**A.   The cases on which Defendant relies are distinguishable from these circumstances.**

Defendant relies primarily on the following three trial-court decisions to support his contention that the collective-knowledge doctrine does not apply in the absence of explicit communication to the arresting officer of sufficient information for that officer to believe there is a legal basis to make an arrest:  *United States v. Connor*, 948 F. Supp. 821 (N.D. Iowa 1996); *United States v. Newman*, 265 F. Supp. 2d 1100 (D. Ariz. 2003); *and United States v. Velazco-Durazo*, 372 F. Supp. 2d 520 (D. Ariz. 2005).

In *United States v. Connor*, police officers investigating a burglary converged on a motel room; entered without a warrant,

exigent circumstances, or the defendant's consent; arrested the
defendant; and seized certain evidence from the burglary.  The
government sought to justify the officers' intrusion by arguing,
among other things, that probable cause to arrest existed based
on the collective knowledge of those officers.  In its analysis
of the collective-knowledge doctrine, the court surveyed
decisions from several circuit and district courts concerning the
degree of communication that may be required among officers to
support a finding of probable cause based on collective
knowledge.  948 F. Supp. at 840-43.  After describing various
approaches by the courts, the district judge noted "other patent
constitutional infirmities [in this case] undermine the officers'
entry into the motel room and arrest of the occupants," and,
accordingly, the judge granted the defendant's motion to suppress
without reaching the collective-knowledge issue.  *Id.* at 843.

     In *United States v. Newman*, two police officers came upon
a vehicle with out-of-state plates in front of a house where
there had been earlier calls to the police reporting domestic
violence and near the place a stolen car previously had been
discovered.  A woman was sitting in the car, and a man, the
defendant, appeared to be walking away from it.  After the
officers confirmed the vehicle was stolen, one officer went to
contact the woman while the other went toward the man.  In
quickly developing events, the officer in contact with the woman

developed probable cause to believe the defendant also had been
in the vehicle and signaled the other officer to arrest the
defendant.  The other officer, however, handcuffed the defendant
before seeing the signal.  The trial court, citing *United States
v. Connor*, concluded the arresting officer did not have probable
cause to arrest the defendant based on collective knowledge at
the moment he applied the handcuffs because he had not seen his
partner's signal.  The court, therefore, granted the defendant's
motion to suppress.

In *United States v. Velazco-Durazo*, several police officers
converged on the defendant's residence intending to conduct a
"knock and talk" encounter to investigate an anonymous tip that
the house was being used to stash marijuana.  After persistent
knocking by the officers that extended over several minutes, the
defendant answered the door under circumstances that the trial
court found to constitute a seizure.  When determining whether
there was reasonable suspicion to support the seizure, the trial
court considered the government's reliance on the collective
knowledge of the various officers on the scene.  The government
argued, in particular, an odor of drug-masking agents detected by
one officer, which was not communicated to or detected by the
officer who seized the defendant, established the requisite
suspicion to support the seizure.  The trial court, however,
granted the defendant's motion to suppress because

> the officers who detected the odor of masking agents
> did not communicate that fact to [the arresting
> officer], nor did they suggest to him before the
> seizure that they had reasonable suspicion of criminal
> activity. [The arresting officer's] later knowledge of
> masking agents cannot form the basis of reasonable
> suspicion because it came after the seizure.

*United States v. Velazco-Durazo*, 372 F. Supp. 2d at 528.

All of these cases, however, are distinguishable from this matter because they involved an assessment of probable cause or reasonable suspicion developing in the field under quickly evolving and uncertain circumstances. Here, on the other hand, it is undisputed that the JTF and DEA officers already had probable cause to stop and to search Defendant's vehicle and to arrest him when they called for the "walled off" stop of Defendant's vehicle. In addition, probable cause in this case grew out of a long-term, judicially supervised, multi-agency investigation instead of a quick assessment of rapidly evolving circumstances. Moreover, although the trial courts in each of these cases relied on by Defendant interpreted the collective-knowledge doctrine to require, at the least, communication of the existence of probable cause to the arresting officer, none of these interpretations of the collective-knowledge rule has been reviewed by an appellate court. Indeed, in the Ninth Circuit, it appears

> there is room in our precedent to conclude that the
> collective knowledge of law enforcement can support
> reasonable suspicion, even if the information known to
> others is not communicated to the detaining officer

> prior to a *Terry* stop, *cf. United States v. Butler*, 74
> F.3d 916, 921 (9ᵗʰ Cir. 1996)(holding that "collective
> knowledge of police officers involved in an investi-
> gation, even if some of the information known to other
> officers is not communicated to the arresting officer"
> can establish probable cause). . . .

*United States v. Terry-Crespo*, 356 F.3d 1170, 1177 (9ᵗʰ Cir.

2004).

Accordingly, in the absence of clear guidance from the Ninth

Circuit, this Court does not find the reasoning of the decisions

on which Defendant relies to be persuasive under these particular

circumstances.

**B.    In light of probable cause to stop and to search
Defendant's vehicle and to arrest Defendant for a drug
crime, Defendant does not have any Fourth Amendment
interest that was violated under these circumstances.**

Even if the collective-knowledge doctrine cannot be applied

in these circumstances, the government argues suppression is not

warranted.  The government points to the Supreme Court's

observation in *United States v. Michigan* that

> the more apt question in such a case is "whether,
> granting establishment of the primary illegality, the
> evidence to which instant objection is made has been
> come at by exploitation of that illegality or instead
> by means sufficiently distinguishable to be purged of
> the primary taint."

126 S. Ct. 2159, 2164 (2006)(quoting *Wong Sun v. United States*,

371 U.S. 471, 487-88 (1963)(internal citation omitted)).  Because

the drug investigators legally could have obtained all of the

evidence seized if they had made the stop, the government argues

the failure to provide Deputy Hoslett with the formulaic

26 -  OPINION AND ORDER

words pronouncing "probable cause" did not result in an exploitation or violation of Defendant's Fourth Amendment rights. The Court agrees.

Accordingly, under the circumstances of this case, the Court concludes the absence of explicit communication to Deputy Hoslett that there was probable cause to arrest Defendant does not require suppression of the evidence seized.

**VI. The record regarding Defendant's *Miranda* issues still needs to be developed.**

Despite their respective arguments that the other party has waived further proceedings concerning Defendant's *Miranda* issues, it is apparent to the Court that neither party intended to give up their positions on this matter when they narrowed the scope of the evidentiary hearing to the other issues raised in Defendant's Motion.

Accordingly, the Court will conduct further proceedings in due course to determine the unresolved *Miranda* issues.

<u>CONCLUSION</u>

For these reasons, the Court **DENIES** Defendant Covarrubias's Motion to Suppress (#62) **except** as to Defendant's "*Miranda Inquiry*." The Court will schedule further proceedings shortly to

address the unresolved *"Miranda"* issues.

IT IS SO ORDERED.

DATED this 4th day of January, 2007.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge